UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>GEE-KUNG CHANG, ET AL.,<br><br>    Defendants. | Criminal Action<br>No. 1:21-CR-00109-AT-JSA<br><br>**Oral Argument Requested** |

## DEFENDANT GEE-KUNG CHANG'S MOTION TO DISMISS COUNTS TWO THROUGH TEN FOR FAILURE TO STATE AN OFFENSE

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Defendant Gee-Kung Chang ("Professor Chang") respectfully requests that this Court dismiss Counts Two through Ten for failing to state an offense. Specifically, the Government has failed to allege that Georgia Tech was deprived of money or property, let alone that such money or property was the object of the scheme, as required by the Supreme Court in *Kelly v. United States*.

## BACKGROUND

The indictment in this case alleges a four plus year scheme to violate 18 U.S.C. § 371, conspiracy against the United States via visa fraud (hereinafter "conspiracy to commit visa fraud"), 18 U.S.C. § 1349, conspiracy to commit wire fraud, and eight

counts of 18 U.S.C. § 1343, wire fraud.[1]  During the relevant
time period, Professor Chang was a fully tenured professor at
Georgia Tech and coconspirator Jianjun Yu was the Director of
the optics laboratory for a private company known as ZTE.  *See*
Indictment at ¶¶ 6, 7.  Professor Chang and Mr. Yu allegedly
identified seven "students and researchers affiliated with
Chinese universities" to come to the United States and "work at
ZTE in Morristown, New Jersey."  *Id.* at ¶ 11(a).

Of course, foreigners typically need a visa to work in the
United States.  To get around this requirement, the Government
claims Professor Chang "abused his position as a professor at
Georgia Tech" by arranging for these seven individuals to
"fraudulently obtain and maintain J-1 Visas."  *Id.* at ¶ 11(b).
On the J-1 Visa paperwork, the seven individuals claimed their
"site of activity" and residence would in Atlanta, Georgia.  *Id.*
at ¶ 11(c).  Once in the United States, Professor Chang
allegedly directed these individuals to move to New Jersey in
order to work out of ZTE's optics laboratory in that state.  Mr.
Yu would then secure housing for these individuals in New Jersey
so that they could work out of his lab.  *See Id.* at ¶ 13.  The
Indictment alleges 37 overt acts in furtherance of the visa

---

[1] Professor Chang vigorously disputes many of these facts, which
he assumes *arguendo* are true only for the purposes of this
Motion to Dismiss.  For ease of reading, he does not include the
phrase "according to the Indictment" in each sentence.

fraud conspiracy, which include various instances of Mr. Yu recommending students to Professor Chang, Mr. Yu leasing an apartment in New Jersey, the individuals working in New Jersey, Professor Chang "caus[ing]" the individuals to sign forms with inaccurate information, and Professor Chang supposedly misleading Georgia Tech. *See, e.g.*, *id.* at ¶¶ 27-28, 30, 45, 23, 25, 38.

The Government takes this visa fraud conspiracy and contends that the same underlying conduct supports a claim of wire fraud conspiracy and eight underlying counts of wire fraud because Georgia Tech paid about $10,000 in salary via direct deposit to these seven individuals while they were working "for ZTE." *Id.* at ¶ 53. In particular, the Indictment asserts that "GEE-KUNG CHANG hired J.Z. and X.L. as postdoctoral researchers. J.Z. and X.L. received a salary from Georgia Tech that was set by CHANG. J.Z. and X.L., at JIANJUN YU's direction, worked at ZTE at certain times during their employment with Georgia Tech, unbeknownst to Georgia Tech officials." *Id.* at ¶ 51(a)-(b).

Critically, the Government has not alleged that these seven scholars are coconspirators, indicted or otherwise. The Government also does not allege that the work these scholars were doing in New Jersey is any different than the work that they were doing when they were in Atlanta (or would have been different had they stayed in Atlanta the whole time). The

3

Government also does not allege that ZTE was not reimbursing Georgia Tech for the work done by these scholars.

Separately, the Government issued Mr. Yu's employer, ZTE, notice of a probation violation for the conduct outlined above (ZTE had previously pled guilty to unrelated charges). *See United States v. ZTE Corporation*, 3:17-CR-120 (N.D.T.X. 2017). Critically, the Government only sought to prove visa fraud against ZTE, not wire fraud. In that matter, in an effort to show these seven scholars should have had work visas, the Government repeatedly emphasized that ZTE was reimbursing Georgia Tech for the salaries of the individuals in question. *See, e.g.*, Revocation Hearing Tr. at 81, 83 (attached as Exhibit A) (stressing that Georgia Tech will not increase one of the scholar's salary until ZTE pays Georgia Tech); 83:24-25, 84 ("[W]e need to pay wages through a third party. [Georgia Tech] is our third party."); 224:10-13 (in summation arguing that "the big companies on [a Georgia Tech PowerPoint that was introduced into evidence] were giving money. Sponsorship means money that comes from a public or private entity outside of Georgia Tech.")

## STANDARD OF REVIEW

Typically, an indictment will be legally sufficient if it includes "the elements of the offense intended to be charged, and sufficiently apprise[s] the defendant of what he must be prepared to meet." *United States v. Bobo*, 344 F.3d 1076, 1083

(11th Cir. 2003).  However, "[i]f a question of law is involved, then consideration of the motion [to dismiss] is generally proper."  *United States v. Korn*, 557 F.2d 1089, 1090 (5th Cir. 1977)[2]; *see also United States v. Madera*, 528 F.3d 852, 859 (11th Cir. 2008) (dismissing indictment as a matter of law); *United States v. Al-Arian*, 308 F. Supp. 2d 1322, 1332 (M.D. Fla. 2004) ("this Court may resolve a motion to dismiss in a criminal case when the 'infirmity' in the indictment is a matter of law and not one of the relevant facts is disputed."); *United States v. Bemis*, No. 8:19-CR-458-T-33AAS, 2020 WL 1046827, at *1 (M.D. Fla. Mar. 4, 2020), *appeal dismissed by Gov't*, No. 20-11288-AA, 2020 WL 3669601 (11th Cir. June 10, 2020) (same).  In such circumstances, a court shall consider if "factual allegations in the indictment, when viewed in the light most favorable to the government, were sufficient to charge the offense as a matter of law."  *United States v. deVegter*, 198 F.3d 1324, 1327 (11th Cir. 1999).  "In determining whether an indictment is sufficient, we read it as a whole and give it a 'common sense construction.'"  *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009).

---

[2] Eleventh Circuit has adopted all pre-1981 Fifth Circuit cases as binding.  *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

**ARGUMENT**

    a. <u>Tricking the United States Government into issuing a visa is not wire fraud.</u>

The gravamen of this case is that the United States feels it was tricked into issuing J-1 issues that it otherwise would not have issued.  The redress for this is clear: charge the alleged perpetrators with 18 U.S.C. § 371, conspiracy against the United States via visa fraud, which the Government has done.  And while Professor Chang is innocent, his defense to this charge is factual (and thus a matter for trial).

However, post-*United States v. Cleveland*, what the Government cannot do is claim that such a scheme makes it the victim of mail or wire fraud.  The federal wire fraud statute makes it a crime to effect (with use of the wires) "any scheme or artifice to defraud, or for obtaining **money or property** by means of false or fraudulent pretenses, representations, or promises.  18 U.S.C. § 1343."  *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (emphasis added).  The "money or property requirement" applies to any charge under § 1341 or § 1343.  *See McNally v. United States*, 483 U.S. 350, 359 (1987).[3]

---

[3] The Court has long made clear that when interpreting either mail or wire fraud, precedent from the other is applicable.  *See, e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005) ("We have construed identical language in the wire and mail fraud statutes *in pari materia.*").

In Cleveland, the Court examined whether the government parts with "property" when it gives out a license based on fraudulent statements.  531 U.S. 12, 20 (2000).  In unanimously determining that there was no property interest at bar, the Court stressed the operative question is whether "the object of the fraud [is] 'property' in the victim's hands" not whether the lies "frustrated the State's right to control."  *Id.* at 23, 26. Visas like licenses, are not property in the state's hands. *See also Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F. Supp. 3d 63, 69 (D.N.J. 2021) (Applying *Cleveland* and holding that "[l]ike a license, a visa has no value to the government beyond the revenue stream from application fees…Such a 'purely regulatory' scheme does not invoke traditional property rights.").  Thus, tricking the Government into issuing a visa does not meet the money or property requirement of wire fraud.

      b. <u>The Indictment fails to properly allege an object of the scheme was Georgia Tech's money or property.</u>

Rather than simply proceed on the properly pled visa fraud conspiracy, the Government attempts to stretch its allegations to overcome this wire fraud hurdle.  It claims the visa fraud scheme actually created a second victim besides the federal government.  Georgia Tech, it theorizes, was also a victim because either: (1) it did not know the location of its employees; or (2) it paid employees a salary while they were

working for ZTE.  Neither works.  The first is plainly not a
property interest under *Cleveland* and the second is not
adequately alleged, presumably because the Government knows the
facts do not support the bare minimum requirements for a "salary
theory" wire fraud prosecution.

      i.  <u>The right to decide where state employees
physically work is not a property interest, and
thus cannot support a wire fraud charge.</u>

Although Cleveland dealt with licenses, the Court made
clear—and continues to stress—that its holding went beyond
licensing and permitting and included anything that was not a
traditional property right in the victim's hand.  "Intangible
rights of allocation, exclusion, and control amount to no more
and no less than [the state's] sovereign power to regulate" and
therefore do not implicate property.  *Id.* at 23.  Indeed,
holding otherwise would impermissibly "arm federal prosecutors
with power to police false statements in an enormous range of
submissions to state and local authorities."  *Id.* at 26; *see
also Kelly*, 140 S. Ct. at 1572 (emphasizing that "this Court has
already held that a scheme to alter [] a regulatory choice is
not one to appropriate the government's property."); *Sekhar v.
United States*, 570 U.S. 729, 737 (2013) (employee's yet-to-be-
issued recommendation to employer was not "obtainable
property."); *Blaszczak v. United States*, 141 S. Ct. 1040 (2021)
(vacating and remanding; on remand the government has

acknowledged nonpublic, predecisional government information is not "money or property.").

Nevertheless, the Indictment stresses that the means and manner of the wire fraud conspiracy was for two of the visiting scholars to "receive[] a salary from Georgia Tech that was set by CHANG…[and] work[] at ZTE at certain times during their employment with Georgia Tech, unbeknownst to Georgia Tech officials."  Indictment at ¶ 51(a)-(b).  But what is the "property in [Georgia Tech's] hands" here? There is none.  While Georgia Tech might have the right to control where its employees physically work, that interest goes to its "intangible right[] of allocation, exclusion, and control" and thus, under *Cleveland*, is not a property interest.  531 U.S. at 13.  In the same vein, many employers would likely expect to have accurate residential information from their employees.  But such honest information is the opposite of a property interest.  *See McNally* (banning the right to honesty); *Skilling v. United States*, 561 U.S. 358, 403-407 (2010) (same, in the context of honest services fraud, absent a bribe or a kickback); *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) ("the statute is 'limited in scope to the protection of *property rights,*' and the ethereal right to accurate information doesn't fit that description."); *United States v. Yates*, 16 F. 4th 256, 265 (9th Cir. 2021) ("[t]here is no cognizable property interest in 'the

ethereal right to accurate information.'"). Thus, the mere fact that the Government alleges Georgia Tech was misled about the physical location of members of its workforce is not enough to bring wire fraud charges.

      ii. <u>The Government has not and cannot allege the salary paid to these visiting scholars was the object of the alleged fraud.</u>

The Government seems to recognize the tenuous nature of its theory and offers a second one: Georgia Tech paid two of these scholars via direct deposit "[e]ven though [they] were working for ZTE." Indictment at ¶ 51(c). But the Supreme Court's recent unanimous holding in *United States v. Kelly* forecloses the Government's theory of prosecution, or—at a minimum—requires it to allege more.

      1. <u>The Salary Theory of Mail and Wire Fraud</u>

  "The salary theory of mail fraud originated as an effort to limit the effects of *McNally*. Because *McNally* did not question the use of the mail fraud statute generally to prosecute frauds devised to obtain money or property, in his dissent, Justice Stevens suggested that some deprivations of intangible rights could be recharacterized as deprivations of money or property…" *United States v. Turner*, 465 F.3d 667, 677 (6th Cir. 2006). Indeed, *United States v. Goodrich* is illustrative of this prosecutorial technique. 871 F.2d 1011 (11th Cir. 1989). In *Goodrich*, state employees were accused of

a bribery scheme.  Post-*McNally* (but before Congress made honest services fraud illegal) the government ultimately claimed the money or property obtained was the salaries of these corrupt state employees.  The *Goodrich* Court rejected this end-run around *McNally's* limitations.  *See Goodrich*, 871 F.2d at 1013–14 ("[T]his [salary] 'property interest' is indistinguishable from the intangible right to good government described in *McNally* and cannot sustain the mail fraud count.").  Other circuits reached a different conclusion. *See United States v. Granberry*, 908 F.2d 278, 279 (8th Cir. 1990) (affirming "salary theory" prosecution for an individual who concealed material facts on his job application) *and United States v. Doherty*, 867 F.2d 47, 61 (1st Cir. 1989) (same for an individual who cheated on public service exam to secure a promotion).

### 2. *United States v. Kelly*

*Kelly* provided much need clarity for when an individual's salary can sustain the requirement that the victim lose money or property.  Arising out of what is commonly known as the "Bridgegate" scandal, the defendants—senior officials in the New Jersey Governor's Office—directed the use of toll lanes on the George Washington Bridge away from the town of Fort Lee and towards other routes (which would cause a massive traffic jam) as political retribution for the mayor of Fort Lee declining to endorse the sitting governor in his reelection campaign.  No.

2:15-CR-00193-SDW-2, 2017 WL 1233891 (D.N.J.).  A unanimous
Court stressed that "[u]nder settled precedent, the officials
could violate those laws only if an object of their dishonesty
was to obtain the [the government's] money or property."  140 S.
Ct. 1565, 1568 (2020).

     In an attempt to overcome this restriction, the Government
advanced the "salary theory" of wired fraud, claiming that the
salary of an extra toll worker—who would not have been working
but for the scheme, which the defendants knew—constituted the
loss of money or property.  The Court rejected this argument and
provided clear guidance: "[the salary] must play more than some
bit part in a scheme: **It must be an 'object of the fraud.'**" *Id.*
at 1573 (emphasis added).  Or put differently, "a property fraud
conviction cannot stand when the loss **to the victim is only an
incidental byproduct of the scheme**." *Id.* (emphasis added).

     The Court then outlined two previous cases where this bar
would have been met.  *Id.* ("Suppose that a mayor uses deception
to get 'on-the-clock city workers' to renovate his daughter's
new home.  Or imagine that a city parks commissioner induces his
employees into doing gardening work for political
contributors…the cost of those employees' services would qualify
as an economic loss to a city, sufficient to meet the federal
fraud statutes' property requirement.") This is because "[t]he
entire point of the fraudsters' plans was to obtain the

employees' services." *Id.* But it noted that in a numerous
cases such costs will be incidental. For example, in *Cleveland*
"the fraud on Louisiana's licensing system doubtless imposed
costs calculable in employee time: If nothing else, some state
worker had to process each of the fraudster's falsified
applications …[but]… **those costs were '[i]ncidental'**… [and]
could not sustain the conviction for property fraud." *Id.*
(emphasis added). Or in *Kelly*, while it was foreseeable that an
extra toll worker would work, "[t]he cost of the employee hours
spent on implementing that plan was its incidental byproduct."
*Id.* at 1574.

### 3. <u>The Government's artful pleading is not enough.</u>

After alleging 11 pages and 48 paragraphs regarding visa
fraud, the Government attempts to stretch the same conduct to
include wire fraud under a "salary theory" of property loss. As
a threshold matter, its theory of wire fraud seems somewhat
illogical. Professor Chang and Mr. Yu allegedly created a
complex scheme to bring skilled workers from China, but the
object of this fraud was to transfer small direct deposits to
these workers, who were not co-conspirators? Read in the
totality, it seems the object of the scheme outlined in the
Indictment was to trick the United States into issuing work

visas and the minimal payments from Georgia Tech were a mere
byproduct of this scheme.

However, even if this is the Government's theory, it is not
adequately alleged.  Presumably to work around *Kelly's*
restrictions, the Government includes the following paragraph:

> Even though J.Z. and X.L. were working for ZTE, GEE-
> KUNG CHANG directed Georgia Tech funds to be paid as
> J.Z.'s and X.L.'s salaries via direct deposit
> payments.

Indictment at ¶ 51(c).  But this does not get the Indictment
where it must be for two independent reasons.

### a. Working "for ZTE" does not mean the scholars were not also working "for Georgia Tech."

People can work multiple jobs or one job for two entities
which are partnering together (as the Government acknowledged in
the probation revocation hearing for ZTE was occurring here).
Merely alleging the scholars where preforming labor "for ZTE" is
not the same as alleging they were not also performing work for
Georgia Tech.  Indeed, *United States v. Shelton*, decided post-
*Kelly*, dealt with this very issue.  There the Government
actually alleged the use of government "resources (such as
computers, printers and storage space)" and that city employees
ran "campaign fundraisers and other campaign activities during
regular work hours."  No. 19-3388, 2021 WL 1937260, at *774 (7th
Cir. May 14, 2021).  This was sufficient post-*Kelly* because,

14

"[T]he defendants were alleged to be using government employees on government time to benefit their own personal interests **rather than** to attend to their government jobs." *Id.* at *775 (emphasis added).  In other words, they were getting paid to do one job and instead doing another.  Professor Chang's indictment does not contain similar allegations—it does not allege that the scholars did NOT perform work for Georgia Tech.  It would be as if the Government in *Shelton* only alleged that government employees worked for the campaign and were silent about whether they performed their city duties.

Presumably, the Government has not included such allegations because it cannot.  It knows these scholars were fulfilling their duties to Georgia Tech (indeed, neither the scholars nor Georgia Tech has told it otherwise).  This alone is fatal to the Indictment and can be the end of the inquiry.  The Court need only wade further into this Motion if it holds otherwise.

                                     b. The Government has acknowledged ZTE was paying Georgia Tech for the work done by the scholars.

ZTE had an agreement with Georgia Tech to pay compensation in exchange for research labor by "faculty, staff and students." ZTEG00135339 (attached as Exhibit B).

The Government cannot meaningfully dispute this; it emphasized it to secure a probation violation against ZTE:

> **Q.  Prosecutor:** Is there a cooperation agreement mentioned in there?
> **A. FBI Agent:** Yes.
> **Q.** And does that relate to the technical cooperation fees we saw in the previous exhibits being asked for reimbursement by Mr. Yu?
> **A.** It can, yes.
> **Q.** What's your understanding of technical cooperation fees in the context of the investigation?
> **A.** Technical cooperation fees are either formal agreements with Georgia Tech that ZTE pays. It could also be paid through donations at Georgia Tech as it discussed in the email or directly paid to the J-1 visa holders.

Revocation Hearing Tr. at 82:3-14.[4] *See also id.* at 224:10-13 (in summation stating "the big companies on [a Georgia Tech PowerPoint that was introduced into evidence, which included ZTE] were giving money. Sponsorship means money that comes from a public or private entity outside of Georgia Tech."); *id.* at 83:24-25 (agent reading email between senior ZTE officials stating "…we need to pay wages through a third party.  [Georgia Tech] is our third party…").

---

[4] A district court can consider pertinent facts outside the indictment that are not in dispute.  See, e.g., *United States v. Weaver*, 659 F.3d 353, 355 n.1 (4th Cir. 2011) (collecting cases and stating "[a]s circuit courts have almost uniformly concluded, a district court may consider a pretrial motion to dismiss an indictment where the government…does not dispute the pertinent facts.")

      i.  <u>The phrase "were working for ZTE,"
thus fails to actually allege that
Georgia Tech's money or property
was the object of the fraud.</u>

Against this backdrop, alleging two of the scholars "were
working for ZTE" while remaining strategically silent regarding
whether ZTE was paying Georgia Tech for this labor cannot
suffice.  Such phrasing falls short of alleging *any* desire to
take of Georgia Tech's money or property in the form of salary—
let alone that it was an "object of the scheme."  To hold
otherwise would allow prosecutors to effectively plead around
*Kelly* by simply referencing salary and remaining silent on
whether salary was the object of the scheme.  *Cf. United States
v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009) ("In determining
whether an indictment is sufficient, we read it as a whole and
give it a 'common sense construction.'").

      ii.  <u>*United States v. Takhalov* also
requires dismissal as alleged.</u>

The wire fraud counts fail for a different but related
reason. The Government has not and cannot allege that there was
a scheme to defraud Georgia Tech, as opposed to merely a scheme
to deceive.  In *Takhalov*, the parties agreed "that the
defendants had tricked men to come into the defendants' clubs.
The government presented evidence that the defendants had hired
Eastern European women—known as 'Bar Girls' or 'B-girls'—to pose
as tourists, locate visiting businessmen, and lure them into the

defendants' bars and nightclubs."  827 F.3d 1307, 1310 (11th

Cir. 2016), *as revised* (Oct. 3, 2016), *opinion modified on*

*denial of reh'g,* 838 F.3d 1168 (11th Cir. 2016).  "The parties

also disagreed about the legal significance of the lies that the

B-Girls used to get the men to come into the clubs in the first

place.  In the government's view, the jury could convict the

defendants of wire fraud based on those lies alone."  *Id.* at

1311.  The Eleventh Circuit's answer was a resounding no:

> [T]he law in the Eleventh Circuit makes clear that a
> defendant "schemes to defraud" only if he schemes to
> "depriv[e] [someone] of something of value by trick,
> deceit, chicane, or overreaching."  But if a defendant
> does not intend to harm the victim—"to obtain, by
> deceptive means, something to which [the defendant] is
> not entitled"—then he has not intended to defraud the
> victim."
>
> From that conclusion, a corollary follows: a schemer
> who tricks someone to enter into a transaction has not
> "schemed to defraud" so long as he does not intend to
> harm the person he intends to trick. And this is so
> even if the transaction would not have occurred but
> for the trick. For if there is no intent to harm,
> there can only be a scheme to deceive, but not one to
> defraud.

*Id.* at 1312-1313 (internal citations omitted).  Here, the

visiting businessmen received the drinks they purchased and thus

there was no scheme to defraud (as opposed to a scheme to

deceive about the nature of the women that took them to the

bar).  Thus, the alleged victims "received exactly what they

paid for," and there was no wire fraud.  *Id.* at 1314.

The same is true here.  Alleging that the visiting scholars in question "were working for ZTE" says nothing about whether Georgia Tech received the benefit of its bargain with ZTE. Indeed, nowhere does or can the Government allege that Georgia Tech, the supposed victim of the wire fraud charges, received anything other than "exactly what it paid for."  Therefore, as a matter of law, the wire fraud allegations are deficient.

        iii.   <u>The incompatibility between what the Government argued to secure a probation violation by ZTE and what is alleged in the wire fraud counts creates a severe risk of a Due Process Clause violation.</u>

"[I]t is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime."  *Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 538 (1998) (granting habeas petition when state argued incompatible theories in separate murder trials); *see also Stumpf v. Mitchell*, 367 F.3d 594, 611 (6th Cir. 2004), *judgment rev'd in part, vacated in part sub nom. on other grounds* ("[W]e now join our sister circuits in finding that the use of inconsistent, irreconcilable theories to convict two defendants for the same crime is a due process violation."); *Smith v. Groose*, 205 F.3d 1045, 1050-51 (8th Cir. 2000) ("In short, what the State claimed to be true in Smith's case it rejected in

Cunningham's case, and vice versa…The State's use of factually contradictory theories in this case constituted "foul blows," error that fatally infected Smith's conviction."); *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) ("This flip flopping of theories of the offense was inherently unfair…The state cannot divide and conquer in this manner.  Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth.").

During the revocation hearing, the Government repeatedly emphasized that ZTE was paying these scholars through Georgia Tech to secure labor that should have required a work visa.  *See supra* b.ii.b.3.  The Government now must prove that taking Georgia Tech's money or property was the object of the fraud. *See supra* b.ii.2.  These theories are irreconcilable and would amount to a Due Process violation if the Government proceeds in this fashion at trial.  Nevertheless, if the Government seeks to thread such a seemingly narrow needle, requiring the Indictment to allege an actual deprivation of Georgia Tech's money and property is necessary.  *Cf. Hamling v. United States*, 418 U.S. 87, 117 (1974) (Indictments must "contain[] the elements of the offense charged...").

## CONCLUSION

For the foregoing reasons, Professor Chang's Motion to Dismiss Counts Two through Ten should be granted.

                                        Respectfully submitted,

Dated: June 13, 2022                    */s/ Brian T. Kelly*
                                        Brian T. Kelly (admitted *pro hac vice*)
                                        Robert A. Fisher (admitted *pro hac vice*)
                                        Lauren A. Maynard (admitted *pro hac vice*)
                                        NIXON PEABODY LLP
                                        Exchange Place
                                        53 State Street
                                        Boston, MA 02109
                                        Tel: 617-345-1000
                                        Fax: 617-345-1300
                                        bkelly@nixonpeabody.com
                                        rfisher@nixonpeabody.com
                                        lmaynard@nixonpeabody.com

                                        */s/ Molly Hiland Parmer*
                                        Molly Hiland Parmer (No. 942501)
                                        PARMER LAW
                                        1201 West Peachtree Street
                                        Suite 2300
                                        Atlanta, GA 30309
                                        Tel: 404-795-5060
                                        Fax: 404-795-5117
                                        Molly@Parmer.law

                                        *Attorneys for Gee-Kung Chang*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been formatted in Courier New 12 pt., in accordance with Local Rule 5.1, and I have on this day served a true and correct copy of the foregoing pleading upon counsel for the government by electronically posting through the District Court's ECF filing system, addressed as follows:

        Samir Kaushal
        Office of the U.S. Attorney
        Northern District of Georgia
        600 United States Courthouse
        75 Ted Turner Dr., S.W.
        Atlanta, GA 30303
        404-581-6000
        Samir.kaushal@usdoj.gov

Dated: June 13, 2022           */s/ Lauren A. Maynard*
                                   Lauren A. Maynard