IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,     :

         v.         :  CRIMINAL ACTION NO.
                            1:21-CR-109-AT-JSA

GEE-KUNG CHANG,         :

      Defendant.        :

## REPORT AND RECOMMENDATION

This case is before the Court on "Defendant's Motion to Suppress or, in the Alternative, for a *Franks* Hearing" [54] ("Original Motion") and "Defendant's Amended Motion to Suppress or, in the Alternative, for a *Franks* Hearing" [72] ("Amended Motion"). Defendant Gee-Kung Chang seeks to suppress the fruits of a search of his email account because the affidavit in support of the warrant that authorized the search omitted information about the credibility of the confidential source relied on for the affidavit. For the reasons set forth below, the undersigned **RECOMMENDS** that the Original Motion [54] be **DENIED AS MOOT** and the Amended Motion [72] be **DENIED**.

### I.    BACKGROUND

At all times relevant to the instant Motions, Defendant was a professor at the Georgia Institute of Technology ("Georgia Tech"). On December 11, 2018, the Government obtained a warrant to search "electronic communications . . . and email

transaction information . . . associated with gc89@gatech.edu, including all associated e-mail aliases that is stored at premises controlled by the Georgia Institute of Technology at 258 4ᵗʰ Street, NW, Atlanta, GA 30313." GX 1 [74-1] at 5. In order to obtain the search warrant, Special Agent Richard J. Hernandez with the Federal Bureau of Investigation ("FBI") submitted an affidavit, which provided that, according to a particular Confidential Human Source ("CHS"), Defendant was working with Jianjun Yu of Zhongxing Telecommunications Equipment ("ZTE") to bring researchers from Chinese Universities to the United States on J-1 Visas under the guise of having them participate in a work-study program at Georgia Tech in Atlanta, when they would in fact be working at ZTE in New Jersey. DX 5 [72-5] ¶¶ 2, 7. The CHS said that Yu, who had at one time been a Post-Doctoral Fellow under Defendant's supervision at Georgia Tech, used his relationship with Defendant to request that Defendant sponsor certain researchers to enter the United States via J-1 Visas. *Id.* ¶¶ 7, 9.

According to the affidavit, several visitors on J-1 Visas ("Visitors"), who had been sponsored by Defendant, were believed to have worked at ZTE, instead of Georgia Tech—the "Site of Activity" where they were supposed to have worked based on their visa applications. *Id.* ¶ 11. Special Agent Hernandez supported this belief with various sources of evidence such as Visitors' visa applications stating that their Sites of Activity would be Georgia Tech, Requests to Host a Foreign

Visitor or Guest submitted by Defendant to Georgia Tech, U.S. Customs and Border Protection records indicating that a Visitor was travelling between China and New Jersey (as opposed to Atlanta), observations by the CHS as to Visitors' whereabouts, New Jersey driver's licenses for Visitors indicating that they resided in New Jersey, published papers noting that Visitors were affiliated with ZTE (as opposed to Georgia Tech), and Georgia Tech access logs indicating that Visitors rarely accessed the floor where Defendant's office and laboratory were located. *See e.g.*, *id.* ¶¶ 12, 13, 16, 17, 18, 21, 23. The affidavit also explained that, based on the results of a grand jury subpoena, Defendant was believed to have used the gc89@gatech.edu email address (and/or an alias for that email account) to communicate with Georgia Tech employees about the Visitors. *Id.* ¶ 43.

According to Defendant, Special Agent Hernandez's affidavit omits crucial information about the CHS's credibility—specifically, that the CHS (a) was motivated by revenge towards Defendant, (b) was mentally unstable and had discussed shooting fellow students, (c) was racially biased against Chinese people, (d) had previously lied to the FBI, and (e) had been paid[1] by the FBI. Although the affidavit indicates that the CHS was a member of Defendant's research group, it contains virtually no other information about the CHS. *See* DX 5 [72-5] ¶ 17.

---

[1] The Government apparently spent approximately $394.84 on telephone and food expenses for the CHS. Def. Amend. Br. [72] at 9 n.8.

Defendant argues that this scant information fails to paint an accurate picture of the CHS, which he asserts would include the information that follows.

On March 20, 2018, the CHS sent a series of disturbing messages to another student, which read:

> I need a semi-automatic rifle
>
> So I can blow off the heads of those ching chang chong :)
>
> Those insensitive visiting chig chang chongs are so horrible in speaking English so I can't even communicate with them. They are so boorish that they do not care about non-Chinese people and talk so loudly in their own language in a public place

DX 1 [72-1] at 5. Defendant was made aware of these messages and caused them to be reported to the Georgia Tech Police Department ("GTPD"), which conducted an investigation. *Id.* During the investigation, Defendant told the GTPD that the CHS was mentally unstable, had a history of psychiatric treatment, and had been placed in custody in South Korea for stalking a woman. *Id.* at 7-8. The GTPD ultimately closed the case without any criminal charges, and the matter was handled administratively by the Dean of Students' office. *Id.* at 11. As a result of this incident, Defendant gave the CHS a failing grade for the semester, and the CHS was suspended and banned from Georgia Tech's campus for a period of time. Upon his return, the CHS was removed from Defendant's research group, assigned a new advisor, and placed on academic probation. DX 3 [72-3] at 3; DX 10 [73-2] at 3.

In the wake of the investigation and suspension, the CHS sent Defendant a series of angry emails. For example, on September 5, 2018, he wrote, "Hey Mr. Chang, Why did you spread out my past depression treatment history to others without my permission or my doctor's? My doctor was really pissed off on you after he read the police report about you. Please advise." DX 7 [72-7] at 2.

The next day, he emailed the National Science Foundation using a fake name and stated *inter alia* that "visiting students from Chinese universities did not come to my university[2] to join or to cooperate with the ongoing projects in my university." GX 5 [74-5] at 3. He expressed concerns about the propriety of this under "the U.S. VISA regulation[.]" *Id.*

The CHS began meeting with the FBI in September 2018. According to the FBI's reports, the CHS's explanation for why he was no longer a member of Defendant's research group shifted over the course of several interviews with the FBI.

According to a report about a September 17, 2018 interview, the CHS explained that he left Defendant's research group because:

> he and Prof. CHANG had a disagreement over the state of . . . Prof. CHANG's laboratory which [he] believed was messy and unsafe. [CHS] directed younger students in the program to help clean up the laboratory, but this upset Prof. CHANG. [CHS] and Prof. CHANG got

---

[2] He did not say which university he was affiliated with.

into heated discussion, during which, [CHS] became angry and used expletives toward Prof. CHANG.

DX 3 [72-3] at 3.

When he met with the FBI on September 28, 2018, the CHS explained that he "made threatening remarks to Professor Gee-Kung Chang which resulted in [his] removal from Professor Chang's research group." DX 9 [73-1] at 2.

Finally, according to a report on an October 5, 2018 meeting, the CHS "provided additional details concerning his removal from Professor Gee-Kung Chang's research group[,]" specifically:

> The CHS advised that he . . . told [another student] that she should keep the lab clean, which [the other student] did not take well. The CHS and [the other student] got into a heated conversation over text message. During the conversation, the CHS stated that he complained about how the visiting scholars do not clean up after themselves, about Professor Chang, and used racial slurs against Chinese. In addition, the CHS wrote in a text message that he . . . wanted to blow the visiting students['] heads off. The CHS indicated that he . . . did not really want to hurt anyone, but was just using what he . . . deemed to be "locker room talk." CHS stated that [the other student] reported the conversation to Professor Chang, who in turn, reported it to the Georgia Tech PD.

DX 10 [73-2] at 3.

In paperwork related to the FBI's use of the CHS, in response to a prompt about the CHS's motivations for providing information, Special Agent Hernandez stated, "CHS feels wronged by [Defendant,] who was previously the CHS' academic advisor." DX 11 [73-3] at 5.

Defendant filed the Original Motion [54] on July 18, 2022. He then filed the Amended Motion [72] on October 14, 2022. In its response brief [74], the Government raised the issue of Defendant's standing. The Court held a hearing on that issue on December 12, 2022.

In advance of the hearing, Defendant filed a declaration [84] wherein he stated, "Throughout my time working at Georgia Tech, I expected that I had a right to privacy in my Georgia Tech email account. No other person was authorized to read my emails." Chang Decl. [84] at ¶ 4. He added that he "used [his] Georgia Tech email account for personal matters because [he] believed that [he] had a right to privacy in [his] Georgia Tech email account." *Id.* at ¶ 13. He attached various personal emails from his Georgia Tech email account to his declaration, specifically: (a) an exchange with his son regarding taxes, (b) a receipt for travel forwarded to his wife, (c) an exchange with family and friends regarding a snowstorm in Atlanta, (d) an update on a European road trip sent to family, (e) an exchange regarding the deed to property in Virginia, and (f) an exchange regarding a family wedding.

There are two key documents from Georgia Tech that are relevant to employees' expectations of privacy: the "Data Privacy Policy" (GX 2 [74-2]) and the "Login Page" (GX B [92-2]). The Data Privacy Policy states in relevant part:

> In the interest of promoting academic freedom and the mission of the Institute, the Georgia Institute of Technology (Georgia Tech) recognizes its obligation not to infringe upon the reasonable privacy

expectations of its employees and students in their electronic communications and data.

. . .

While personal use of such systems is permitted, as per the Georgia Tech Acceptable Use policy, personal communications and files transmitted over or stored on Georgia Tech systems are subject to the same regulations as business communications.

Georgia Tech is committed to respecting the privacy expectations of its employees and students; however, consistent with this policy, electronic information that is transmitted over or stored in Georgia Tech systems and networks is subject to being audited, inspected and disclosed to fulfill administrative or legal obligations which may include, but are not limited to, the following:

- is necessary to comply with legal requirements or process (e.g., Georgia Open Records Act or subpoena);

- may yield information necessary for the investigation of a suspected violation of law or regulations, or of a suspected infraction of Georgia Tech or Board of Regents policy;

. . .

- is needed for the ordinary business of the Institute to proceed, (e.g., access to data associated with an employee who has been terminated/separated or is pending termination/separation, is deceased, is on extended sick leave, or is otherwise unavailable) . . . .

GX 2 [74-2] at 2. The Policy adds that "[a]ny individual whose personal files and communications exist on a Georgia Tech IT Resource by virtue of unauthorized access will have no expectation of privacy." *Id.* at 3.

The Login Page states:

ATTENTION: When you are finished using all of your authenticated applications, please log out of this system and exit your browser to ensure you do not leave any of your applications (such as your e-mail) open to other users of this machine.

TERMS OF USE

This computer system is the property of Georgia Tech and is available for authorized use only, in accordance with the Computer & Network Usage and Security Policy (CNUSP). Users should have no expectation of privacy, as any and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed to authorized site(s) and/or law enforcement personnel in order to meet administrative and/or legal obligations.

GX B [92-2] at 2.

At the hearing, only one witness testified—Christopher Craig, Georgia Tech's Enterprise Security Architect. Tr. [91] at 12:9-10.[3] Mr. Craig testified, *inter alia*, that the Login Page would have appeared when users sought to log into certain Georgia Tech applications such as email, the grading system, and the human resources system between 2015 and 2020. *Id.* at 31:3-7, 50:20-51:7. He clarified that for email, a user could remain logged into his or her email account on a particular device for years, so the user would not necessarily see the Login Page every time he or she accessed email. *Id.* at 34:19-35:13. That said, he estimated that a professor would see the Login Page "at least once a week" in connection with the use of various

---

[3] The Court refers to the page numbers that appear in the upper right corner of the transcript, not the ECF page numbers.

applications. *Id.* at 51:25-52:1. In an exchange with Defense Counsel, he acknowledged that the Data Privacy Policy was "the key policy at issue[.]" *Id.* at 36:14-17. He also offered his opinion on what a person reading the Data Privacy Policy would understand based on provisions highlighted by Defense Counsel. *See id.* at 37:11-14 ("**Q:** And for someone like a professor who sees that, he's being told there are some reasonable privacy expectations in his communications; right? **A:** Yes."), 38:7-10 ("**Q:** So that's, again, sending another message that, you know, there is some expectation of privacy in their e-mail communications; correct? **A:** Yes.").

The Original Motion and the Amended Motion are now before the undersigned and ripe for review.

## II.    ORIGINAL MOTION

As an initial matter, Defendant's Amended Motion [72] supersedes his Original Motion [54], so the undersigned **RECOMMENDS** that the Original Motion [54] be **DENIED** as **MOOT**.

## III.    STANDING

In order to have standing to challenge a search under the Fourth Amendment, the movant must have a reasonable expectation of privacy in the invaded area. *United States v. Black*, 801 F. App'x 695, 696 (11th Cir. 2020); *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007). "The party alleging an unconstitutional search must establish both a subjective and an objective expectation of privacy. The

subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *King*, 509 F.3d at 1341; *see Smith v. Pelham*, No. 20-13210, 2021 WL 5863412, at *3 (11th Cir. Dec. 10, 2021). The Supreme Court has found that "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government[.]" *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987) (plurality opinion). "Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *Id.* at 718.

The Government argues, *inter alia*, that in light of the Login Page's statement that "[u]sers should have no expectation of privacy[,]" which users would see "at least once a week" in connection with the use of various applications, Defendant cannot have had a reasonable expectation of privacy. GX B [92-2] at 2; Tr. [91] at 51:25-52:1. Defendant counters that the Data Privacy Policy's reference to employees' "reasonable privacy expectations" evinces such an expectation. GX 2 [74-2] at 2.

Where an employer informs employees that they lack an expectation of privacy in their use of the employer's technology, courts have generally found that to be the case. *See United States v. Angevine*, 281 F.3d 1130, 1133-34 (10th Cir. 2002) (professor had no reasonable expectation of privacy in data downloaded onto

university computer where university computers had "splash screen" stating, "all electronic mail messages are presumed to be public records and contain no right of privacy or confidentiality"); *United States v. Castillo*, No. CR20-4092-LTS, 2021 WL 1929547, at *6 (N.D. Iowa May 13, 2021) (no reasonable expectation of privacy where employer's "practices and policies, including a notice that appeared each time an employee logged into the system, clearly informed its employees that they had no expectation of privacy in how they used [employer's] laptops or in what they may have stored on them"), *aff'd*, No. 22-1195, 2022 WL 3355018 (8th Cir. Aug. 15, 2022); *United States v. Busby*, No. CR 11-00188 SBA, 2011 WL 6303367, at **5-6 (N.D. Cal. Dec. 16, 2011) (employee lacked "legitimate expectation of privacy with respect to files stored on . . . laptop" where he signed acknowledgement that users "have no explicit or implicit expectation of privacy" and this message was reinforced by banners), *aff'd*, 613 F. App'x 627 (9th Cir. 2015); *see also Smith*, 2021 WL 5863412, at *4 (city employee lacked expectation of privacy where "city's Computer Use Policy provided that the city had a right to monitor all users of city computing systems").[4]

---

[4] Defendant contends that this issue should be analyzed under the *Asia Global* framework, *see In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 257 (Bankr. S.D.N.Y. 2005), which he claims "has been applied nearly universally across the country." Def. Reply Br. [75] at 3 n.1. Defendant, however, cites no cases from the Eleventh Circuit or this District applying, or even citing, *Asia Global*, much less in the context of a criminal case. In any event, *Asia Global* did not involve emails sent over a

Defendant attempts to get around Georgia Tech's statement on the Login Page that "[u]sers should have no expectation of privacy" by arguing that it is overcome by the Data Privacy Policy's reference to employees' "reasonable privacy expectations." He asserts that to the extent there is inconsistency between the Data Privacy Policy and the Login Page, the Data Privacy Policy should control because it "is approved by Georgia Tech's President's Cabinet, which includes the most senior leaders for various departments on campus" and posted in Georgia Tech's Policy Library; whereas there "is absolutely no evidence suggesting who approved or created the" Login Page. Def. Post-Hrg. Br. [93] at 9.[5] He also argues that based on the record "it is unclear" how often employees like himself were presented with the Login Page in connection with the use of their email. Def. Post-Hrg. Br. [93] at 8.

---

company's system in the face of a clear admonishment that "users should have no expectation of privacy, as any and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed…." Thus, the Court finds the above-cited cases to be more persuasive on the facts of this case.

[5] The undersigned does not understand Mr. Craig's testimony to indicate that the Data Privacy Policy necessarily trumps the Login Page. While he did acknowledge that the Data Privacy Policy is "the key policy at issue," *see* Tr. [91] at 36:11-17 ("**Q:** . . . So you heard a reference to the Data Privacy Policy by both the AUSA and myself; right? **A:** Yes. **Q:** . . . You would acknowledge, that's the key policy at issue here; right? **A:** Yes."), it is also the only statement at issue described as a "policy;" the language on the Login Page is described as "terms of use."

Of the two documents relied upon by the parties, there is only evidence that Defendant would have necessarily seen the Login Page. Through Mr. Craig's testimony, the record shows that Defendant would necessarily have been provided with the clear warnings of the Login Page, and likely was confronted with that language numerous times during his employment. Mr. Craig stated that Defendant would have confronted that screen whenever logging in, whether for purposes of email or, importantly, other systems such as grading. While it is unknown how frequently Defendant would have encountered these warnings, Mr. Craig estimated based on his experience and knowledge of the systems that it would have likely been on the order of once per week. And, importantly, Defendant did not refute that assertion with any evidence of his own, despite bearing the burden of proof on this issue.

By contrast, even if the Data Privacy Policy could be read as inconsistent with the banner warnings of the Login Page, Defendant did not testify that he ever saw or relied on this Policy document, and does not establish how it was ever provided to employees, if at all. Indeed, it is unclear whether Defendant was even aware of this document during the time of his employment or whether it was, instead, uncovered in litigation and relied upon solely in retrospect. Again, Defendant is the party with the burden of proof to establish standing, and therefore an evidentiary gap on such questions generally must be resolved against him.

The Court has considered Defendant's affidavit, and overruled the Government's objections based on its lack of cross-examination. But the affidavit largely consists of bare, unexplained, legal conclusions such as "I expected that I had a right to privacy in my Georgia Tech email account." Chang Decl. [84] at ¶ 4. Absent from this declaration is any explanation of any facts upon which Defendant supposedly reached the conclusion that he possessed any such right, particularly in light of the clear language advising otherwise in the Login Page. The Court therefore cannot find Defendant's bare legal conclusions, while admissible, to be persuasive and sufficient to sustain his burden of proof. At a minimum, even if these statements suggested a subjective belief that he possessed a privacy right, these conclusions are not sufficient to show that this belief was objectively reasonable when Defendant was advised (likely multiple times) that he "should have no expectation of privacy, as any and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed…."

That Defendant engaged in a few innocuous personal emails using his office email account does not necessarily show that he had a reasonable privacy expectation. *See United States v. Hassoun*, No. 04 60001 CR BROWN, 2007 WL 141151, at **1-2 (S.D. Fla. Jan. 17, 2007) (no reasonable expectation of privacy despite company policy that "did not forbid employees' personal use of their assigned computers"). It is no doubt commonplace in modern society for office

workers to use the convenience of office technology from time to time for incidental personal use. But this does not mean that they necessarily believe such personal use to be private and not potentially subject to monitoring or review by the company. And where the employee is expressly told that "users should have no expectation of privacy, as any and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed," the employee would have no objectively reasonable basis to claim otherwise.

Finally, the Court ascribes no evidentiary significance to the fact that the Government used a search warrant to obtain these materials. Such a choice does not reflect any sort of admission that a search warrant was necessary because of any privacy right held by Defendant. Indeed, the Government is encouraged to obtain warrants where possible, even if in the excess of caution, and to not unnecessarily skirt Fourth Amendment lines.

Thus, the undersigned finds that Defendant has not shown that he had a reasonable expectation of privacy in his email account, and thus he lacks standing to move to suppress the search. Nevertheless, as this document is not a final ruling but rather only a Recommendation, the undersigned will proceed to consider and offer alternative findings on the merits of the *Franks* issue, in the event any reviewing court disagrees as to the lack of standing. As explained below, even if Defendant

could show standing, his motion would still fail because inclusion of the omitted facts about the CHS would not have prevented a finding of probable cause.

### IV.   WHETHER SUPPRESSION IS WARRANTED

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court explained that false statements filed in support of a search warrant can require suppression of evidence obtained. But to obtain such relief, a Defendant bears the burden to show two elements. First, the Defendant must allege and offer proof of a "deliberate falsehood or . . . reckless disregard for the truth," not just "negligence or innocent mistake . . . ." *Franks*, 438 U.S. at 171. Second, even in cases of deliberate falsehoods, suppression is not warranted unless "the remaining content is insufficient" to support the issuance of the warrant. *Id.* 171-72. Suppression can result not just from the inclusion of affirmative false statements, but also from the intentional or reckless omission of facts. *See United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). However, "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997). Here, Defendant has not shown that inclusion of the information about the CHS's biases and prior bad conduct in Special Agent Hernandez's affidavit would have prevented a finding of probable cause.

Where an affidavit omits information about an informant's bias or prior bad acts, the Eleventh Circuit has refused to suppress evidence obtained as a result of the ensuing warrant if the informant's information is independently corroborated. *See United States v. Fussell*, 366 F. App'x 102, 103 (11th Cir. 2010) (omission of fact that sources had lied to police did not invalidate warrant where information from sources was corroborated); *United States v. Haimowitz*, 706 F.2d 1549, 1556 (11th Cir. 1983) (where unsavory information relating to the background of an informant was omitted from an affidavit, warrant was still valid due in part to independent corroboration of information from informant by another person).

Here, the essence of the information from the CHS in the affidavit is that Defendant was part of a scheme whereby Visitors came to the United States under the guise of working with Defendant as part of a work-study program at Georgia Tech, but were instead working at ZTE in New Jersey. *See* DX 5 [72-5] ¶¶ 7, 9, 17, 27, 34. This basic narrative is corroborated by substantial independent evidence such as Visitors' visa applications stating that their Sites of Activity would be Georgia Tech, Requests to Host a Foreign Visitor or Guest submitted by Defendant to Georgia Tech, U.S. Customs and Border Protection records indicating that a Visitor was travelling between China and New Jersey (as opposed to Atlanta), New Jersey driver's licenses for Visitors indicating that they resided in New Jersey, published papers noting that Visitors were affiliated with ZTE (as opposed to Georgia Tech),

and Georgia Tech access logs indicating that Visitors rarely accessed the floor where Defendant's office and laboratory were located. *See e.g.*, *id.* ¶¶ 12, 13, 16, 18, 21, 23. Given this extensive corroboration, the undersigned finds that the inclusion of the information about the CHS's bias and misdeeds in the affidavit would not have prevented a finding of probable cause. [6]

This ample corroboration also distinguishes the case at hand from those cited by Defendant where courts granted (or reversed denials/affirmed grants of) suppression motions due to omissions of negative information about informants. *See United States v. Lull*, 824 F.3d 109, 120 (4th Cir. 2016) (noting "unusual degree of reliance on the informant and [a] near-total lack of corroborating evidence"); *United States v. Glover*, 755 F.3d 811, 817 (7th Cir. 2014) (informant's "tip was minimally corroborated"); *United States v. Hall*, 113 F.3d 157, 160 (9th Cir. 1997) ("virtually no evidence at all without the informant's testimony"); *United States v. Anderson*, No. 7:19-CR-00027, 2020 WL 249479, at **9-12 (W.D. Va. Jan. 16, 2020) (only

---

[6] Relatedly, Defendant is not correct in his assertion that without the CHS's representations, there would be "nothing to tie Professor Chang to conspiring with anyone to urge, induce, or trick [the Visitors] into not changing (let alone concealing or lying about) their location." *See* Def. Amend. Br. [72] at 18-19. The affidavit indicates, for example, based on other information, that Defendant submitted several Requests to Host Foreign Visitors to Georgia Tech, *see* DX 5 [72-5] ¶¶ 13, 25, 32, but that those Visitors did not actually work at Georgia Tech and were instead at ZTE in New Jersey. This information "ties" Defendant to the scheme, and also sufficiently corroborates the CHS's statements more generally tying Defendant to the scheme.

corroborating information provided in affidavit was itself misleading); *United States v. Simmons*, 771 F. Supp. 2d 908, 917 (N.D. Ill. 2011) (noting "weak police corroboration of the [informant's] statement and the absence of any other indicia of reliability of the [informant] and his statement"); *see also United States v. Bradford*, 905 F.3d 497, 504-05 (7th Cir. 2018) (distinguishing *Glover* in part because the information from the *Glover* informant "was only minimally corroborated"); *United States v. Bosley*, 232 F. App'x 638, 640 (9th Cir. 2007) (distinguishing *Hall* because the *Hall* "informant's tip was neither particularly detailed nor independently confirmed").

Defendant suggests that the relevant inquiry is whether the affidavit would establish probable cause without the information provided by the CHS. *See* Def. Amend. Br. [72] at 17 ("Without the information provided by the CHS, the Affidavit is clearly insufficient to support probable cause."); Def. Reply [75] at 18 ("Once [the] information [from the CHS] is knocked out, the government cannot meet its burden."). In the case of omissions, however, the question is instead whether there would be probable cause if the omitted information about the CHS was *included*. *See Haimowitz*, 706 F.2d at 1556 ("even if the magistrate had known of [informant's] prior acts, the affidavit would still have supported a finding of probable cause"); *United States v. Miller*, No. 4:11-CR-0044-RLV-WEJ, 2012 WL 1606043, at *4 (N.D. Ga. Mar. 26, 2012) ("if the omitted facts [about the informant]

had been included in the affidavit, it would have still established probable cause for the search"), *report & rec. adopted by* 2012 WL 1610129 (N.D. Ga. May 7, 2012); *see also United States v. Ortega*, 679 F. App'x 766, 769 (11th Cir. 2017) ("including the information that [defendant] alleges was wrongfully omitted would not have altered the probable cause finding"); *Madiwale*, 117 F.3d at 1327 ("even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause").

The inclusion of the facts allegedly known to Special Agent Hernandez as to the CHS's biases and prior bad acts would not have negated the CHS's information. Of course, a reviewing Magistrate Judge would likely have viewed the information from CHS with caution, although that is always the case with information from confidential sources. Crucially, however, the reviewing Magistrate Judge in this case would have also had the benefit of the substantial corroborating information set forth in the remainder of the Affidavit. This information would have lent sufficient reliability to the CHS's statements such as to establish probable cause, notwithstanding the lack of more complete disclosure about the CHS. Thus, Defendant's Amended Motion should be denied.[7]

---

[7] Because Defendant has failed to satisfy the second *Franks* element, the Court need not determine whether the affiant deliberately or reckless testified falsely.

**V.**     **CONCLUSION**

For the reasons set forth above, the undersigned **RECOMMENDS** that the Original Motion [54] be **DENIED AS MOOT** and the Amended Motion [72] be **DENIED** on the merits.

**IT IS SO RECOMMENDED** this 14th day of February, 2023.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE